IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**JORDAN EDWARD COLEMAN,**

Plaintiff,

v.

**MICHAEL J. ASTRUE,**
Commissioner of Social Security,

Defendant.

3:11-cv-01112 RE

**OPINION AND ORDER**

**REDDEN**, Judge:

Plaintiff Jordan Coleman ("Coleman") brings this action to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for disability insurance benefits ("DIB"). For the reasons set forth below, the decision of the Commissioner is affirmed and this matter is dismissed.

/ / /

1 - OPINION AND ORDER

## BACKGROUND

Coleman was born in 1982, and filed his applications for DIB and SSI benefits in January 2008. He has a high school equivalent education, and past relevant work experience as a cashier, cashier's assistant, certified nursing assistant, telemarketer, technical support, and as a warehouse associate Tr. 172, 174. Coleman alleges disability since November 30, 2006, due to attention deficit hyperactivity disorder ("ADHD"), borderline personality disorder, social anxiety disorder, and depression Tr. 167. His application was denied initially and upon reconsideration. A hearing was held in November 2009. The Administrative Law Judge ("ALJ") found him not disabled. Coleman's request for review was denied, making the ALJ's decision the final decision of the Commissioner.

## ALJ's DECISION

The ALJ found Coleman had the medically determinable severe impairments of major depressive disorder, dysthymic disorder, ADHD, and personality disorder. Tr. 22.

The ALJ found that Coleman's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. *Id.*

The ALJ determined that Coleman retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with no public interaction and only casual interactions with others on a routine basis, and limited to predictable, non-hazardous routines. Tr. 24. Coleman disputes this finding.

The ALJ found Coleman was not disabled because he could perform his past relevant work as a stock clerk. Tr. 26. Coleman disputes this finding.

///

## MEDICAL EVIDENCE

The relevant medical evidence indicates that Coleman saw a psychiatrist in 2000, but could not afford to continue treatment. Tr. 170. In December 2005 he requested an antidepressant and Adderall for recurrent depression, but the medical record does not reflect that Coleman reported debilitating symptoms. Rather, he reported that he and his girlfriend had broken up. Mayna Helman, M.D., noted that his affect was almost flat and he was disinterested. Tr. 255. Dr. Helman prescribed Zoloft.

In June 2006 Sarah DuVal, R.N., P.M.H.N.P., noted that Coleman was unemployed and without insurance, and prescribed Lexapro. Again, Coleman did not describe debilitating symptoms, and he was described as "[o]riented X3, pleasant...slumping, tired." Tr. 259. Ms. DuVal "strongly encouraged him to resume taking an SSRI. He did well with it in the past." *Id.*

In April 2007, a few months after his alleged onset date of November 30, 2006, Coleman began treatment with Michael Tso, M.D. Tr. 256-58. He reported multiple symptoms of ADHD, including difficulty getting organized, listening, and being nervous in social situations. He was working full-time as a nursing assistant, and had been off Adderall for 5-6 months. Tr. 257. Dr. Tso noted "clear evidence" of ADHD, and prescribed Adderall.

In May 2007 Dr. Tso noted that Coleman's lack of insurance and finances limited him to a short acting form of Adderall that did not provide sufficient coverage of symptoms for an entire workday. Dr. Tso noticed that Coleman had run out of Adderall two days prior, and was "clearly distracted," and having a "harder time making decisions," "harder time remembering things," and that his speech was almost tangential and his thought processes a bit disoriented. Tr.

256.. Dr. Tso noted that the Adderall "is quite effective overall." *Id.* Dr. Tso's records do not reflect any reports of debilitating depression symptoms.

In March 2008 Gary Sacks, Ph.D. reviewed the medical record and conducted a Psychodiagnostic Examination. Tr. 287-90. Dr. Sacks noted that Coleman's social manner was "marked by his quick speech." Tr. 288. His affect was irritable and his mood labile. Coleman reported quickly and widely varying emotions. Dr. Sacks noted that it "was difficult for [Coleman] to provide qualitative or quantitative information, especially regarding...his employment history and alleged ADHD symptomatology." *Id.* Dr. Sacks reported that Coleman had no trouble sitting still for the interview, and demonstrated adequate attention for simple tasks. Reasoning and insight were limited. He complained of "an unstable self-concept and easy boredom." *Id.* His speech was "excessively impressionistic and lacking in detail. His manner was theatrical with exaggerated expression of emotion." *Id.* He sometimes avoided eye contact.

Coleman described intense and unstable interpersonal relationships. He was unemployed, and had been fired for performance issues. Coleman reported working in fast food restaurants, Wal Mart, and a warehouse. When asked why he left those jobs Coleman said he "'tries [his] hardest,' but because of lack of psychoactive medications he cannot perform. He explained, 'I just fail.'" Tr. 289. He was taking Adderall which helped to stabilize his emotions. Coleman reported that he got along poorly with most people, and felt anxious in crowds. Coleman reported that he had quit using alcohol, marijuana, and methamphetamine three years earlier. Tr. 289. Coleman did not describe debilitating depression symptoms, nor did he tell Dr. Sack's that he was unable to leave his bed for days at a time. Dr. Sacks's diagnostic impression was Personality Disorder, NOS, Borderline and Histrionic Traits, with a GAF of 60. Tr. 290.

Coleman first asserted that he was unable to get out of bed for days at a time in Disability Report Appeal Form dated May 23, 2008. Tr. 220, 222.

At the November 17, 2009 hearing, Coleman was taking Celexa but did not believe it was providing much benefit. Tr. 333. Coleman testified that he is often so depressed that he can not get out of bed or do almost anything for three to four days at a time. Tr. 58, 220, 222. Absenteeism contributed to the loss of many jobs, including his most recent job, where he missed more than two days of work per month. Tr. 39, 43, 44. At the time of the hearing, Coleman was taking two classes at a community college but missed many classes and " forgot" to show up for one final. Tr. 51. Coleman testified that he had trouble getting organized for work, that he was often late, and would forget key items like his identification badge. Tr. 39.

Coleman reported that he had to work at a very slow pace to avoid getting distracted and to maintain focus. Tr. 196. He stated that he was fired from almost every job he had held because he worked too slowly and could not finish a task within the expected time frame. Tr. 40-45. He failed some of his college classes because he could not keep up with the work. Tr. 51.

Coleman testified that he cannot tolerate criticism from supervisors, and that it causes him to be unable to perform. Tr. 48. When employed, he cannot control his emotions, keep his composure, or remain on the job after criticism. Tr. 60. The ALJ ordered the record kept open for the addition of another psychological assessment.

On November 24, 2009, Jeffrey Sher, Psy. D., conducted a four and a half hour long psychological assessment. Tr. 327-33. Coleman reported treatment with Zoloft and Paxil in about 2000, but did not like the way the drugs affected him. Tr. 329. He reported that he had sought counseling and found it unhelpful. *Id.*

5 - OPINION AND ORDER

Dr. Sher noted that Coleman's test results indicated "some difficulty in mental processing... with increased complexity of the task." Tr. 331. Coleman showed "signs of difficulty in concentration and attention," and obvious tension. Tr. 331, 333. He required guidance to stay focused. Tr. 331. Asked why he could not sustain employment, Coleman stated that it was "hard to get myself motivated I guess when I'm going through a rough spot. I stop caring about work or anything." Tr. 327. Dr. Sher noted that Coleman appeared significantly depressed, that he did not appear to be exaggerating or histrionic, and that he seemed defeated and demoralized. Tr. 328.

Coleman reported that he drives his partner to work in the morning, then goes back to bed. He often sleeps most of the day. He often lacks energy to do chores, but does some laundry and cooking. There are times when he does not shave or shower for days. He watches television and plays video games, but no longer enjoys drawing or music. Tr. 329.

Dr. Sher noted that Coleman was fully oriented, with adequate attention and persistence. Tr. 330. He clearly understood the instructions and did not appear to become unduly fatigued. He showed good persistence. Test results indicated some difficulty in mental processing with increased complexity of the task. Tr. 331.

Dr. Sher's diagnostic impression was Major Depressive Disorder, Recurrent Moderate Severity, Dysthmic Disorder, Moderate, and ADHD. Dr. Sher opined that depression is Coleman's main challenge to successful employment. Tr. 333.

///

///

///

## DISCUSSION

Coleman contends that the ALJ erred by: (1) finding him not fully credible; (2) improperly rejecting the opinions of examining and reviewing providers; (3) improperly weighing lay testimony; and (4) improperly determining his RFC.

## I. Credibility

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir 1995). However, the ALJ's findings must be supported by specific, cogent reasons. *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir 1998). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear and convincing." *Id.* The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Id.* The evidence upon which the ALJ relies must be substantial. *Reddick,* 157 F.3d at 724. *See also Holohan v. Massinari,* 246 F.3d 1195, 1208 (9th Cir 2001). General findings (e.g., "record in general" indicates improvement) are an insufficient basis to support an adverse credibility determination. *Reddick* at 722. *See also Holohan,* 246 F.3d at 1208. The ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir 2002).

In deciding whether to accept a claimant's subjective symptom testimony, "an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms." [Footnote omitted.] *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir 1996).

7 - OPINION AND ORDER

> Under the *Cotton* test, a claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged...." *Bunnell,* 947 F.2d at 344 (quoting 42 U.S.C. § 423 (d)(5)(A) (1988)); *Cotton,* 799 F.2d at 1407-08. The *Cotton* test imposes only two requirements on the claimant: (1) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom.

*Smolen,* 80 F.3d at 1282.

The ALJ found Coleman's allegations as to the intensity, persistence and limiting effects of his symptoms not credible to the extent that they are inconsistent with the RFC. Tr. 24.

## A. Debilitating Symptoms Are Not Supported By The Medical Record

The ALJ stated that Coleman does have mental limitations, but "his allegations of debilitating symptoms are not supported by the medical evidence of record.." Tr. 24. It is true that the ALJ cannot require medical evidence of the severity of a symptom. *Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Cir. 1996), citing *Bunnell v. Sullivan,* 947 F.2d 341, 344 (9th Cir. 1991)(en banc). But it is fair to say that when, as here, the claimant alleges symptoms so severe as to cause him to be unable to get out of bed for several days at a time, but does not report those symptoms to his medical providers, an issue of credibility arises. The ALJ appropriately noted that Coleman's allegations of debilitating symptoms are not supported by the medical evidence.

## B. Failure to Seek Treatment

The ALJ noted that "despite allegations of debilitating depression, he has not sought any therapy and there is no evidence he has ever done so, even when he was working." Tr. 24.

Coleman points out that his assertion that he cannot afford any additional treatment is

8 - OPINION AND ORDER

uncontested. He testified that he has had no income or health insurance since he lost his last job on November 30, 2007, and he relies on his mother and roommate for his basic needs. Tr. 187, 208. The ALJ cannot use Coleman's poverty and lack of optimal mental health treatment to discredit his symptom testimony. *Nguyen v. Chater,* 100 F.3d 1462, 1465 (9th Cir. 1996).

### C. Symptoms Improve with Adderall

The ALJ noted that Coleman has been prescribed Adderall for ADHD, and that Coleman reports that "when he is on the medication he can focus and get more work done and he is motivated." Tr. 24. The ALJ referred to a May 2007 chart note from Michael Tso, M.D. Tr. 256. Dr. Tso noted that Coleman's lack of insurance and finances limited him to a short acting form of Adderall that did not provide sufficient coverage of symptoms for an entire workday. Dr. Tso noticed that Coleman had run out of Adderall two days prior, and was "clearly distracted," and having a "harder time making decisions," "harder time remembering things," and that his speech was almost tangential and his thought processes a bit disoriented. *Id.* Dr. Tso noted that the Adderral "is quite effective overall." *Id.*

Coleman testified that he cannot always afford to purchase Adderall, and that he forgets to take it in a timely manner or obtain timely refills or new prescriptions. Tr. 187, 256, 56-57. That Coleman's symptoms improve when he is on medication is not a valid reason to find him less than fully credible.

///

///

///

///

9 - OPINION AND ORDER

### D. Activities of Daily Living

The ALJ stated:

> Despite his mental symptoms, the claimant is able to function independently, prepare meals, clean the house, and utilize public transportation [Tr. 289]. He is attending school and while he has done poorly in some classes, he has done well in others [Tr. 245-46].

Tr. 25.

A claimant's daily activities can provide the basis for an adverse credibility determination when those activities contradict other testimony or the activities meet the threshold for transferable work skills. *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007). Daily activities may be grounds for an adverse credibility finding "if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989). An adverse credibility finding based on activities may be proper "if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace." *Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir. 2005). The ALJ must make "specific findings relating to [the daily] activities" and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination. *Burch,* 400 F.3d at 681.

The ALJ stated that Coleman is able to function independently, citing Dr. Sacks's March 2008 report:

> He is able to prepare simple meals. He cleans the house on his own. He dresses, bathes, and grooms independently. He travels by bus.

Tr. 289.

The ALJ referred to Coleman's college classes, citing transcripts indicating that Coleman passed two classes for seven credit hours in Spring term 2009, passed one class and failed two classes of six credit hours in Summer term 2009, and was taking two classes for seven credit hours in Fall term 2009. Tr. 245-46. The ALJ is permitted to draw an adverse inference as to Coleman's credibility because these activities are inconsistent with Coleman's alleged symptoms and limitations.

The Commissioner argues that the ALJ properly found that Coleman's daily activities contradict his testimony of debilitating mental limitations, citing *Stubbs-Danielson v. Astrue,* 539 F.3d 1169, 1175 (9th Cir. 2008). However, the *Stubbs-Danielson* court noted that "[t]he record reflects that the claimant has normal activities of daily living," and that the medical evidence supported the ALJ's determination that the claimant could perform unskilled work. *Id.*

Coleman testified that he is often so depressed that he can hardly get out of bed for three to four days at a time. Tr. 58, 220. He has been fired from multiple jobs, often for working too slowly. Tr. 43-44. Coleman had attendance problems at work and at school. Tr. 52. He has to work at a slow pace to maintain concentration. Tr. 196. Coleman's testimony and assertions are not consistent with what he reported to his treating and examining providers. Tr. 256-57, 327-33.

Coleman notes that the record shows he held about 18 different jobs between 2000 and 2007. Tr. 148-50, SSR 96-7p. The ALJ identified clear and convincing reasons to find Coleman less than fully credible.

///

///

11 - OPINION AND ORDER

## II. Medical Evidence

Disability opinions are reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1). If no conflict arises between medical source opinions, the ALJ generally must accord greater weight to the opinion of a treating physician than that of an examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). In such circumstances the ALJ should also give greater weight to the opinion of an examining physician over that of a reviewing physician. *Id.* But, if two medical source opinions conflict, an ALJ need only give "specific and legitimate reasons" for discrediting one opinion in favor of another. *Id.* at 830. The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

### A. Jeffrey Sher, Psy. D.

Dr. Sher completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental), and found that Coleman was "moderately" limited in his ability to "understand, remember and carry out complex instructions and make judgements on complex work-related decision," "to interact appropriately with supervisors, " and "to respond [appropriately] to usual work situations and [to] changes in a routine work setting." Tr. 322-23. "Moderately" is defined as "more than a slight limitation in this area but the individual is still able to function satisfactorily." Tr. 322.

The ALJ noted Dr. Sher's opinion, and gave it "significant weight." Tr. 25. Coleman argues that the ALJ erred by failing to include in the RFC moderate limitations in his ability to understand and remember complex instructions, to carry out complex instructions, to make judgments on complex work-related decisions, and to interact appropriately with supervisors.

12 - OPINION AND ORDER

However, by the definition supplied on the form in question, "moderately" means the individual is still able to function satisfactorily. Accordingly, the ALJ did not err by failing to include those limitations in the RFC.

**B. Dorothy Anderson, Ph.D.**

In her April 2008 review, state agency psychologist Dr. Anderson completed a "Mental Residual Functional Capacity Assessment" ("MRFCA") form in which she checked boxes indicating that Coleman's mental impairments impose moderate limitations in his ability to interact appropriately with the general public, his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and his ability to set realistic goals or make plans independently of others. Tr. 291-92. Robert Henry, Ph.D. also reviewed the record and agreed with Dr. Anderson. Tr. 313.

Coleman contends that the ALJ erred by not stating "clear and convincing" or "specific and legitimate reasons" to discount the opinions of Drs. Anderson and Henry. The ALJ did not mention Dr. Anderson by name, but did discuss and give "significant weight" to her report. Tr. 25. The ALJ noted that the state agency physicians found Coleman "limited in close general public interaction but is able to get along on a casual, routine social basis...He would do best with predictable, nonhazardous routines." Tr. 25.

The MRFCA form lists twenty functional factors in section I. Section II provides room for remarks, and Section III contains the actual Functional Capacity Assessment. The Social Security Program Operations Manual Systems ("POMS") specifies that the section I of the MRFCA "is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment.**"

13 - OPINION AND ORDER

Emphasis in original. Section III of the form contains the actual mental residual functional capacity assessment. *Id.*

In Section III, Dr. Anderson determined that Coleman was "[n]ot significantly limited" in the areas of 'understanding and memory' and in 'sustained concentration and persistence'. Tr. 293. In the area of 'social interaction,' Dr. Anderson found Coleman limited "in close, general public interaction, but otherwise gets along on casual, routine social basis." Tr. 293. Dr. Anderson found that Coleman would do best with "predictable, nonhazardous (Rx side effects) routines and would benefit from help setting realistic goals (voc guidance)." *Id.*

"Moderately limited" as used in the MRFCA form means that an individual's capacity to perform the activity is impaired, but, according to the POMS, it does not mean that an individual is precluded from performing that activity. POMS DI 24510.063. "Markedly Limited" is checked "when the evidence supports the conclusion that the individual cannot usefully perform or sustain the activity." *Id.*

The ALJ found Dr. Anderson's report consistent with the assessment of Arthur Lewy, Ph.D., a reviewing psychological consultant. Tr. 25, 320. Accordingly, the ALJ did not reject medical opinions in formulating Coleman's RFC.

### III. Lay Testimony

The ALJ has a duty to consider lay witness testimony. 20 C.F.R. § 404.1513(d); 404.1545(a)(3); 416.945(a)(3); 416.913(d); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition. *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993). The ALJ may not reject such testimony without comment and must give

reasons germane to the witness for rejecting her testimony. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). However, inconsistency with the medical evidence may constitute a germane reason. *Lewis*, 236 F.3d at 512. The ALJ may also reject lay testimony predicated upon the testimony of a claimant properly found not credible. *Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009).

Coleman contends that the ALJ improperly considered the lay witness statements of his roommate, Alex Luisi. In February 2008, Mr. Luisi reported that Coleman watches television, does chores, "tries to look for work if feeling motivated but gets frustrated," has mood swings, and has "a hard time concentrating/staying focused." Tr. 206. Mr. Luisi stated that Coleman has trouble sleeping, he prepares simple meals, and does laundry, cleaning, dishes and trash, and does not socialize. Tr. 207.

The ALJ noted Mr. Luisi's statement and found him generally credible. The ALJ noted that Coleman reported he was able to focus when on medication, Coleman had not sought treatment for depressive symptoms, and there was no evidence of difficulty with routine social interactions. Tr. 25.

On November 16, 2009, the day before the hearing, Mr. Luisi signed a statement in which he asserts that Coleman is easily distracted and has trouble staying focused on simple tasks. Mr. Luisi stated that Coleman stays in bed or on the couch for 20 out of 24 hours a day at least several times a month. Tr. 334. Mr. Luisi states that Coleman has appeared "stressed out most of the time instead of just off and on, like before...for close to a year now." *Id.*

The ALJ did not address Mr. Luisi's November 2009 statement. However, where lay witness testimony does not describe any limitations not already described by the claimant, and

15 - OPINION AND ORDER

the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony, it is harmless error for the ALJ to fail to discuss the lay witness testimony. *Molina v. Astrue,* 674 F.3d 1104, 1114 (9th Cir. 2012).

## IV. Step Four and the Vocational Expert

At step four in the sequential proceedings, the claimant has the burden to prove that he cannot perform his prior relevant work "either as actually performed or as generally performed in the national economy." *Lewis v. Barnhart,* 281 F.3d 1081, 1083 (9th Cir. 2002). The ALJ determines if the claimant can perform his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv). If the claimant can perform such work he is not disabled and the sequential evaluation concludes. *Id.* In construing step four findings, the ALJ may draw upon a vocational expert's testimony to show that claimant can perform work in the national economy. 20 C.F.R. §§ 404.1560(b)(2); 416.960(b)(2). The ALJ's questions to the vocational expert must include all properly supported limitations. *Osenbrock v. Apfel,* 240 F.3d 1157, 1165 (9th Cir. 2001). The ALJ may then compare the demands of a claimant's past relevant work with the claimant's RFC in determining whether the claimant may presently perform such work. SSR 82-62, "Titles II and XVI: A Disability Claimant's Capacity to do Past Relevant Work" (*available at* 1982 WL 31386, at *3).

The ALJ concluded that Coleman had the RFC to return to past relevant work as a stock clerk. Tr. 26. Coleman contends that the Vocational Expert ("VE") offered opinions that conflict with the *Dictionary of Occupational Titles* ("DOT"), that the VE did not explain the basis for the conflicting opinion, and that the ALJ erred by relying on the VE's testimony in finding that Coleman could return to work as a stock clerk.

The ALJ asked the VE whether a hypothetical person with the same age, education and work experience as Coleman, and no exertional limitations, could perform any of his past work with "no public interaction....But can have some casual public contact in the work place," with "predictable, non-hazardous routines." Tr. 64. The VE testified that the stock clerk position would be available, as it did not involve public contact. *Id.* The ALJ found that Coleman retained the capacity to perform work as a stock clerk both as he actually performed it and as it is generally performed in the economy. Tr. 26.

Coleman described work as a "cashier associate." Tr. 174. He described stocking shelves and handling cash, without the use of machines, tools or equipment, and without the use of technical knowledge or skills. He did no writing or completion of reports. *Id.* He described the job as "[l]ifted and moved various items," and did not supervise anyone else. Tr. 177.

The ALJ's determination that Coleman retained the capacity to return to work as a stock clerk is supported by substantial evidence.

## CONCLUSION

For these reasons, the ALJ's decision that Coleman is not disabled is based on correct legal standards and supported by substantial evidence. The decision of the Commissioner is affirmed.

IT IS SO ORDERED.

Dated this ⎯⎯ day of February, 2013.

JAMES A. REDDEN
United States District Judge